**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 04:09 PM January 9, 2014**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 13 |
| | ) | |
| BRIAN ALAN SKILES, | ) | CASE NO. 13-61565 |
| | ) | |
| Debtor. | ) | JUDGE RUSS KENDIG |
| | ) | |
| | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| | ) | |

The issue in this case is how to calculate household size for the purpose of the means test. The facts involve recurring issues relating to children from multiple parent sets living part-time at different locations. For the reasons that follow, the court selects the "economic unit" test for household size and decides in favor of the chapter 13 bankruptcy trustee.

Brian Alan Skiles ("Debtor") filed a voluntary chapter 13 petition and chapter 13 plan on June 14, 2013. On August 16, 2013, Debtor amended his original chapter 13 plan ("Amended Plan"). The Amended Plan proposes monthly plan payments of $1,270.00 for a period of thirty-six months. Toby L. Rosen, the chapter 13 trustee ("Trustee"), objected to Debtor's Amended Plan because she calculates Debtor's annualized current monthly income as above the applicable median family income for an Ohio household the same size as Debtor's, hereinafter referred to as Debtor being "above median," requiring Debtor to make chapter 13 plan payments for sixty months. Trustee and Debtor disagree on two main points, both of which may alter the amount of time Debtor is required to make chapter 13 plan payments: (1) Who should be included within Debtor's calculation of "household" for the purpose of determining the applicable median household income in Ohio; and (2) Should Debtor's live-in girlfriend's gross income, net income, the amount she contributes to Debtor for household expenditures, or some other amount be included within Debtor's current monthly income ("CMI")?

1

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1334 and the general order of reference entered in this district on April 4, 2012. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

Although Trustee and Debtor disagree on the legal standard that should be used to calculate the size of Debtor's "household," the relevant facts are not in dispute. The following seven people have lived within Debtor's home for at least a portion of the last six months: Debtor, his wife[1] ("Wife"), Debtor's seven and nine year old children, and Wife's seven, twelve, and eighteen year old children. Debtor is divorced from his children's mother and has custody of the children for eight out of every fourteen days. Debtor claimed one of his children on his 2012 income tax return. Neither Debtor nor Trustee specify the amount of time Wife's children live with Debtor, but Debtor's bankruptcy petition lists Wife's three children as dependents. Wife claimed one of her children on her 2012 income tax return.

Debtor's calculation of CMI lists monthly gross wages of $4,647.43, monthly rental and other real property income of $1,225.00, and a $2,000.00 monthly contribution from Wife, for CMI of $7,872.42. When multiplied by twelve, Debtor's annualized CMI is $94,469.16. The applicable median income for a seven person household within Ohio, as determined by the United States Census Bureau ("Census Bureau"), is $98,570.00, which is greater than Debtor's annualized CMI. However, if Debtor's household size is reduced to six members, the applicable median household income is $90,470.00, which is below Debtor's annualized CMI.[2] The median family income within Ohio that corresponds with Debtor's household size will hereinafter be referred to as the "applicable median." While Debtor only claims $2,000.00 of Wife's income in his CMI, her 2012 tax return shows gross income of $40,443.00, which equates to monthly gross income of $3,370.25. According to Wife's paystubs for the six months immediately preceding Debtor's bankruptcy, her average monthly gross income is $3,868.73 and her average monthly net income is $2,568.02.

### Law and Analysis

Section 1325 of the bankruptcy code (the "Code") governs the confirmation requirements of a chapter 13 plan, including the length of time a chapter 13 debtor must make plan payments. This timeframe is known as the "applicable commitment period," the length of which is:

> **(i)** 3 years; or
> **(ii)** not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than . . .
> **(II)** in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

---

[1] At the time Debtor filed his bankruptcy petition Debtor and Wife were living together, but were not married. On August 2, 2013, Debtor and Wife married.

[2] Census Bureau Median Family Income by Family Size, U.S. Department of Just. (Sept. 27, 2013), http://www.justice.gov/ust/eo/bapcpa/20130501/bci_data/median_income_table.htm (Attached as Ex. A).

2

> **(III)** in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $675 per month for each individual in excess of 4; and
> **(B)** may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period.

11 U.S.C. § 1325(b)(4). Therefore, if a debtor's annualized CMI is above the median income for a household of the same size within the same state, the debtor must make plan payments for sixty months unless the creditors are paid in full at an earlier date. As Debtor's Amended Plan proposes to pay 0% to unsecured creditors, his chapter 13 plan cannot be confirmed unless his annualized CMI is below median or he agrees to make plan payments for sixty months.

 To determine if a debtor is above the applicable median, his CMI must be calculated. CMI, a term defined by the bankruptcy code, is "the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period" starting with the month immediately preceding the commencement of the bankruptcy case. 11 U.S.C. § 101(10A). CMI is not limited to the debtor's income, as it also "includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents." Id. § 101(10A)(B). Thus, by definition, income from a nondebtor that is not paid to the debtor for household expenses will not be part of a debtor's CMI. 8 Collier on Bankruptcy, ¶ 1325.11[4][d] (Alan N. Resnick & Henry J. Sommers eds., 16th ed. 2013).

 Before a court can compare a debtor's CMI to the applicable median, the size of a debtor's "household" must be determined. While the term "household" is used within § 1325(b)(4), as well as other sections of the Code,[3] the term is undefined. Johnson v. Zimmer, 686 F.3d 224, 232 (4th Cir. 2012); In re Smith, 396 B.R. 214, 216 (Bankr. W.D. Mich. 2008). A number of similar terms are used or cross-referenced by § 1325, such as "family," "dependent," and "dependent children," but like the term "household," the Code does not define these terms either. Johnson, 686 F.3d at 230. For example, § 1325(b) requires a debtor with annualized CMI above the applicable median to satisfy the requirements of the § 707(b) "means test." A debtor that falls under the "means test" may only take expenses "reasonably necessary to be expended . . . for the maintenance and support of the debtor or a *dependent* of the debtor." 11 U.S.C. § 1325(b)(2) (emphasis added). A debtor's "reasonably necessary" expenses under the "means test" are fixed by the Internal Revenue Service ("IRS") National Standards and Local Standards.[4]

---

[3] See, e.g., 11 U.S.C. § 101(8) (defining "consumer debt" as "debt incurred by an individual primarily for a personal, family, or *household* purpose) (emphasis added); id. § 522(d)(3) (allowing a debtor to take an exemption for "*household* furnishings, *household* goods, wearing apparel, appliances, books, animals, crops, or musical instruments, that are held primarily for the personal, afamily, or *household* use of the debtor or a dependent of the debtor.") (emphasis added); id. § 707(b)(2)(A)(ii)(II) (allowing "the continuation of actual expenses paid by the debtor that are reasonable and necessary for care and support of an elderly, chronically ill, or disabled *household* member or member of the debtor's immediate family" within the means test calculation) (emphasis added).

[4] Census Bureau, IRS Data and Administrative Expense Multiplies, U.S. Department of Just. (Aug. 5, 2013), http://www.justice.gov/ust/eo/bapcpa/20130501/meanstesting.htm (Attached as Ex. B).

Therefore, many debtors prefer to be below the applicable median in order to avoid the one-size-fits-all procrustean "means test." Additionally, if a debtor is below median, he is only required to make chapter 13 plan payments for thirty-six months.

After the court has determined the size of a debtor's "household," it must then compare the debtor's annualized CMI to the applicable median. In Ohio, median household income for a single person household is $42,814.00, a two person household is $53,218.00, a three person household is $60,960.00, a four person household is $74,270.00, and each household member above four results in an additional $8,100.00.[5] The significant increase in median family income based on each additional member of a debtor's "household" illustrates the significance of the court's determination.

## I. Determining the size of Debtor's "Household"

As noted above, the word "household" is used throughout the Code but is not defined. When interpreting an undefined word, the court's goal is to give rise to congressional intent, and the starting point is the existing statutory text. Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004). Therefore, the court should give an undefined term its plain meaning, unless such a meaning results in an absurd outcome. Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000). When determining a term's plain meaning, a court should not consider the word in a vacuum, but instead within the statutory context in which the term appears. Smith v. United States, 508 U.S. 223, 229 (1993); Johnson, 686 F.3d at 230. If a term remains ambiguous, even after analyzing it within the statutory context, a court should turn to the statute's intended purpose for guidance. Milner v. Dep't of the Navy, 131 S. Ct. 1259, 1266 (2011); Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 376–77 (2004). While an official form may help a court identify a term's meaning, if the statutory language is in conflict with the official form, the statutory language must prevail. In re Arnold, 376 B.R. 652, 654–55 (Bankr. M.D. Tenn. 2007); In re Law, 2008 WL 1867971, at *7 (Bankr. D. Kan. 2008). In order to preserve statutory continuity, a term is also presumed to have the same meaning each time it appears within a single statutory framework. Cohen v. de la Cruz, 523 U.S. 213, 220 (1998). Finally, when Congress decides to use different words within the same statutory framework, each word should normally be given a different meaning. Johnson, 686 F.3d at 233.

Courts, when applying the above rules of statutory construction, have reached three different definitions of "household:" (1) "heads-on-beds;" (2) "IRS dependent;" and (3) "economic unit." Each definition often results in very different outcomes under the same factual circumstances. While the Sixth Circuit has not decided which definition to use, the Fourth Circuit has adopted the "economic unit" definition. Johnson, 686 F.3d 224. Within the Sixth Circuit, bankruptcy courts have adopted either the "heads-on-beds" or "economic unit" definition. Compare In re Fleck, 2013 WL 4462202, at *3 (Bankr. N.D. Ohio 2013) (using the "economic unit" definition), and In re Jewell, 365 B.R. 796 (Bankr. S.D. Ohio 2007) (same), with In re Smith, 396 B.R. 214 (adopting the "heads-on-beds" definition). Based on the analysis below, the court maintains its use of the "economic unit" definition.

---

[5] Census Bureau Median Family Income by Family Size, U.S. Department of Just. (Sept. 27, 2013), http://www.justice.gov/ust/eo/bapcpa/20131115/bci_data/median_income_table.htm (Attached as Ex. A).

4

### a)  The "Heads-on-Beds" Definition

The "heads-on-beds" definition has been adopted by at least one court within the Sixth Circuit, In re Smith, 396 B.R. 214, as well as a number of courts in other circuits. See e.g., In re Epperson, 409 B.R. 503, 507 (Bankr. D. Ariz. 2009); In re Bostwick, 406 B.R. 867, 872–73 (Bankr. D. Minn. 2009); In re Ellringer, 370 B.R. 905, 910–11 (Bankr. D. Minn. 2007). Neither Debtor nor Trustee ask the court to adopt the "heads-on-beds" definition.

Courts that have adopted the "heads-on-beds" definition claim to do so based on the rule of statutory construction requiring an undefined term to be given its plain meaning, unless such a meaning results in an absurd outcome. Hartford Underwriters Ins. Co., 530 U.S. at 6. However, the word "household" has two dictionary definitions: (1) "[a] group of people who dwell under the same roof"; or (2) "[a] family living together."[6] Black's Law Dictionary 808 (9th ed. 2009); see also In re Smith, 396 B.R. at 216. Faced with these two competing definitions, courts applying the "heads-on-beds" definition have adopted the broad definition of "household." Courts make this choice because a debtor's annualized CMI is compared to the applicable median from Census Bureau information, making it fair to use the Census Bureau's definition of household: "all the people who occupy a housing unit."[7] In re Smith, 396 B.R. at 216; see also 11 U.S.C. § 707(b)(2)(A)(ii)(II); In re Law, 2008 WL 1867971; 6 Collier on Bankruptcy, ¶ 707.04[3][b] ("Because the median family income amounts are derived from census data, it is logical to use the census definition of 'household' to determine the number of people in the household for purposes of this test."). Additionally, the broad definition of "household" is supported by other sections of the Code, such as § 707(b)(2)(A)(ii)(II), which uses both "household" and "family" when listing the specific people a debtor can care for and also include the associated expenses within his bankruptcy schedules while maintaining compliance with the "means test."[8] Because Congress is presumed to use words intentionally, Congress would not use the terms "household" and "family" unless each word was intended to have a distinct and separate meaning. Russello v. United States, 464 U.S. 16, 23 (1983); Johnson, 686 F.3d at 233 ("Congress used the word "household" [in § 1325(b)(4)] as opposed to "family," "dependent child" or "dependent," all of which are used elsewhere in the surrounding and cross-referenced Code provisions," suggesting that "Congress intended the term 'household' to mean something

---

[6] Black's defines "family" as: (1) "[a] group of persons connected by blood, by affinity, or by law;" (2) "[a] group consisting of parents and their children;" or (3) "[a] group of persons who live together and have a shared commitment to a domestic relationship." Black's Law Dictionary 679 (9th ed. 2009).

[7] Current Population Survey (CPS) - Definitions, U.S. Census Bureau, http://www.census.gov/cps/about/cpsdef.html (last updated Oct. 29, 2013) (Attached as Ex. C).

[8] Section 707(b)(2)(A)(ii)(II) states:

> In addition, the debtor's monthly expenses may include, if applicable, the continuation of actual expenses paid by the debtor that are reasonable and necessary for care and support of an elderly, chronically ill, or disabled *household* member or member of the debtor's immediate *family* (including parents, grandparents, siblings, children, and grandchildren of the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case who is not a dependent) and who is unable to pay for such reasonable and necessary expenses.

(emphasis added).

other than what those terms mean"). Because "family" is defined as "[a] group of persons connected by blood, by affinity, or by law," the inference is that "household" must require a less intimate connection, making simply living together sufficient. See Black's Law Dictionary 679 (9th ed. 2009).

Therefore, under the "heads-on-beds" definition, a debtor's "household" "depends solely on the number of residents in a structure and is unconcerned with the presence of a familial or economic relationship between the individuals." In re Robinson, 449 B.R. 473, 478–79 (Bankr. E.D. Va. 2011); In re Smith, 396 B.R. at 217. This broad reading often allows a debtor to claim the largest number of individuals within his bankruptcy "household," thus increasing the applicable median and reducing the likelihood a debtor will be required to comply with the "means test" and sixty month applicable commitment period.

### b)      The "IRS Dependent" Definition

While no court within the Sixth Circuit has adopted the "IRS dependent" definition, it has been adopted by courts in other circuits. See e.g., In re Frye, 440 B.R. 685, 687 (Bankr. W.D. Va. 2010); In re Law, 2008 WL 1867971, at *5; In re Napier, 2006 WL 4128358, at *2 (Bankr. D.S.C. 2006). Trustee asks the court to adopt this definition.

The courts adopting this definition believe that the use of the term "dependent" when determining a debtor's expenses should be consistently applied to a debtor's income and "household" size. See In re Napier, 2006 WL 4128358, at *2. Section 1325(b)(2) of the Code, when discussing the allowable expenses for an above median debtor, only allows expenses "for the maintenance or support of the debtor or a *dependent* of the debtor," and later references the § 707(b) "means test" for help in determining the allowable expenses. (emphasis added). However, § 1325(b)(4), which determines if a debtor is above median, and therefore whether the "means test" applies, references the debtor's "household." Because §§ 1325(b) and 707(b) contain two parts of the same calculation, and one uses "household" while the other uses "dependents," there is logic in defining the terms consistently. Johnson, 686 F.3d at 238. Additionally, courts adopting this definition believe inequitable results will occur if income and expenses are determined using different standards. For example, if a debtor's "household" can include any person living within his home, but he can only take expenses associated with a dependent, a debtor's calculation of disposable income will be distorted. See In re Plumb, 373 B.R. 429, 437 (Bankr. W.D.N.C. 2007). Therefore, even though § 1325(b)(3) and (4) reference a debtor's "household," they "must be read in conjunction with § 707(b)(2)(A)(ii)(I), which allows expenses only associated with a debtor, his spouse, and dependents." In re Napier, 2006 WL 4128358, at *1. These courts also note that the legislative history indicates that § 1325(b)(3) was not intended to alter or expand the scope of the "means test," a result that would occur if a broad definition of "household" is adopted. Id. at *2.

Under the "IRS dependent" definition, a debtor's "household" only includes those people he is able to claim as a dependent on his income tax return. The IRS has adopted a dependency test requiring an individual to satisfy each of the following requirements in order to qualify as an IRS tax dependent: "(1) a relationship test; (2) an age test; (3) a residency test; (4) a financial support test; (5) a joint return test; and (6) a special test for dependent children of more than one

6

person." In re Frye, 440 B.R. at 687. The "IRS dependent" definition is narrow, as it only allows individuals that can satisfy each requirement of the IRS test to be included within a debtor's "household."

### c)    The "Economic Unit" Definition

The "economic unit" definition has been applied at least twice in the Sixth Circuit. In re Fleck, 2013 WL 4462202; In re Jewell, 365 B.R. 796. Additionally, the "economic unit" definition appears to be the majority position. Debtor urges this court to adopt the "economic unit" definition.

Courts adopting the "economic unit" definition do so because they believe it most closely aligns with the purpose of the Code, while also comporting with the statutory text. See generally Johnson, 686 F.3d 224. These courts note that the Code does not define "household," and as the "heads-on-beds" and "IRS dependent" definitions help illustrate, the proper meaning is unclear. Even the dictionary definition of "household" is inconclusive, as it can either be incredibly broad ("[a] group of people who dwell under the same roof"), or more restrictive ("[a] family living together"). Black's Law Dictionary 808 (9th ed. 2009). Because the statutory text is ambiguous, a court should turn to the goals of the Code for guidance. See In re Jewell, 365 B.R. at 801. The ultimate purpose of the Code is to give the honest debtor a fresh start, but not a head start. Indus. Ins. Servs., Inc. v. Zick (In re Zick), 931 F.2d 1124, 1130 (6th Cir. 1991). Similarly, under § 1325(b), "the entire purpose of identifying a debtor's household size is to use that number to determine his or her financial obligations and ability to pay [creditors]" before granting a bankruptcy discharge. Johnson, 686 F.3d at 237. Therefore, courts adopting the "economic unit" definition believe it furthers the Code's goal of providing a debtor a fresh start (but not a head start), by giving an accurate picture of the debtor's true financial position and thus his actual ability to pay his creditors, while also remaining consistent with the Code's text.

Under the "economic unit" definition, "household" is defined as all individuals who act as a single economic unit with the debtor, or, in other words, "those the debtor financially supports and those who financially support the debtor." Johnson, 686 F.3d at 237; In re Morrison, 443 B.R. 378, 386 (Bankr. M.D.N.C. 2011). This definition is not as broad as the "heads-on-beds" definition, which allows the debtor to claim another person simply because they reside in the same structure. However, the method is broader than the "IRS dependent" definition, which would not allow a debtor to include a minor child he supports that fails one of the six IRS requirements. The "economic unit" definition strikes a middle ground, allowing a debtor to claim those individuals who are sufficiently economically connected with the debtor, reflecting the Debtor's true economic circumstances.

### d)    The "Economic Unit" Definition is Best

When evaluating § 1325(b), it becomes clear that the Code does not require a specific definition of "household." Instead a court must decide on the appropriate definition based on some combination of the statutory language, congressional intent, and the Code's overall purpose. See Johnson, 686 F.3d at 234–35; In re Sawdy, 362 B.R. 898, 904 (Bankr. E.D. Wis. 2007) (addressing a different legal issue, but noting that if statutory language is "so plain, so

clear, so unambiguous, that the Court need look no further to determine its meaning . . . then how could six courts have interpreted it one way and five courts have interpreted it in exactly the opposite way? Doesn't the concept of 'plain' meaning carry with it the implication that the same meaning would be 'plain'—ordinary, literal and obvious—to every reader."). Therefore, the court's duty "is to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and the general purposes that Congress manifested." Comm'r v. Engle, 464 U.S. 206, 217 (1984). With these goals in mind, the court adopts the "economic unit" definition.

The "heads-on-beds" definition, at first glance, appears to align with the plain meaning of the statute. However, the term "household" has two very different dictionary meanings. Johnson, 686 F.3d at 233, 235; Black's Law Dictionary 808 (9th ed. 2009). While § 1325(b) does cross reference the Census Bureau's median income tables, "that is not sufficient to demonstrate a congressional intent to adopt the usage utilized by the Census Bureau in its wholly separate sphere of government work." Johnson, 686 F.3d at 235. The Census Bureau's definition of "household" is nicely tailored to the purpose of obtaining accurate demographic information, but "is wholly unrelated to any bankruptcy purpose and does not serve the Code's objective of identifying a debtor's deductible monthly expenses and, ultimately, his or her disposable income." Johnson, 686 F.3d at 224; In re Jewell, 365 B.R. at 801. The "heads-on-beds" definition can also lead to unintended results, by, for example, allowing a debtor who lives with another individual who is not supported by or supporting the debtor to be included within the debtor's "household." See Jewell, 365 B.R. at 800. Therein lies the main problem with the "heads-on-beds" definition, it allows a debtor to include an individual within the debtor's bankruptcy "household" who will have little to no impact on the debtor's actual financial situation, obscuring the Code's goal of discovering the amount a debtor can realistically pay to his creditors. It would be puzzling to utilize a method that is unconcerned with economic relationships when the entire purpose is to determine fairness based on economics.

The "IRS dependent" definition is also flawed, as it only allows a debtor to claim a person as a member of his "household" if the person can be claimed as a dependent on his tax return. Because the income and expense portions of §§ 1325(b) and 707(b) use different terms, it is logical to define the terms consistently. However, no portion of the Code expressly states that the IRS definition of dependent should be used. Johnson, 686 F.3d at 238–39; see also Ransom v. FIA Card Servs., N.A., 131 S. Ct. 716, 726 n.7 (2011). Additionally, the purposes of the tax code and the bankruptcy code are very different. The tax code's purpose is to collect tax revenue for the government, while the term "household" within the Code seeks to determine a debtor's disposable income and the amount he can pay to creditors. See Morrison 443 B.R. at 387–88; In re Jewell, 365 B.R. at 801. Additionally, if Congress had intended the term "household" to refer only to a debtor's dependents that satisfy IRS requirements, a very simple wording change could have achieved that result. Finally, the IRS definition of dependent often fails to reflect the economic realities of a debtor. For example, the definition could result in a debtor being unable to claim a child who lives with him, but for either formal or informal reasons the debtor is unable to claim the child on his tax return (such as a divorce agreement allowing the other spouse to claim the child). See Johnson, 686 F.3d at 239. Similarly, the "IRS dependent" definition would likely not allow a debtor to claim live-in elderly parents whom he cares for. Id.

The "economic unit" definition best aligns with the purposes of the Code, comports with the statutory language, and gives the court the flexibility to adapt to a debtor's unique living situations. See generally id. at 237. "A definition of 'household' that is . . . tailored to reflect a debtor's financial situation focuses directly upon the ultimate purpose of the Code." Id.; see also In re Robinson, 449 B.R. at 481. The "economic unit" definition realizes that there may be individuals who have a significant impact on a debtor's financial reality that do not qualify as a dependent for IRS purposes, or that an individual can live with the debtor without affecting his ability to pay creditors. While the "IRS dependent" and "heads-on-beds" definitions are under and over inclusive, the "economic unit" definition "affords bankruptcy courts the ability to calculate a debtor's disposable income under § 1325(b) in a way that satisfies the language of the Code, all the while steering clear of creating an unrealistic assessment (in either direction) of the debtor's disposable income." Johnson, 686 F.3d at 239.

e)       **Presumptions and Evidentiary Burdens When Using the Economic Unit Approach**

In most situations, bankruptcy courts presume that the information a debtor provides in his bankruptcy schedules is accurate and the burden rests with the Trustee or other objecting party to come forward with evidence showing the falsity. See In re Jewell, 365 B.R. at 802. To encourage a debtor to be truthful, bankruptcy courts have a number of tools at their disposal. For example, if the court learns a debtor has been untruthful, the court can deny the debtor's discharge under § 727 or pursue criminal charges under 18 U.S.C. § 152. Assuming that the debtor has put forward truthful information and requiring the trustee or other objecting party to prove inaccuracies streamlines the bankruptcy process. In order to further assure the accuracy of a debtor's schedules, the trustee reviews the debtor's bankruptcy schedules. If something out of the ordinary is found, the trustee is normally able to investigate the item by obtaining information from a bank, credit card company, governmental agency, or a number of other independent sources. In contrast, a debtor's living situation is normally a very personal matter that can change very quickly and no bank, credit card company, governmental unit, or other source maintains accurate up-to-date records.[9] The trustee's normal processes to check the accuracy of a debtor's bankruptcy schedules is therefore ineffective when monitoring a debtor's "household."

The nature of a debtor's living situation justifies a departure from the normal presumption that a debtor's bankruptcy schedules are accurate. The first reason justifying the departure is that who is within a debtor's "economic unit" is not information a trustee is able to gather through traditional avenues. To obtain the most accurate information the trustee may need to camp out in a van down the street with binoculars. The court has no interest in encouraging a bankruptcy structure where debtor surveillance becomes the most effective way to counter a debtor's "household" size. Second, the evidence of a debtor's "household" size is uniquely in the

---

[9] It is true that the Census Bureau (or often times a bank before authorizing a loan) may inquire into who lives with the debtor. Any information gathered may not be up-to-date, as data gathering may be sporadic or rarely updated. Additionally, unlike a bank or credit card statement which provides very accurate data from which further analysis is often not needed, a document stating the size of a debtor's household will require additional analysis and information before the trustee can determine if the people listed within the document are part of the debtor's "economic unit."

9

hands of the debtor, making it significantly cheaper and easier for the debtor to prove "household" size, instead of the trustee disproving it. See Extrusion Painting, Inc. v. Awnings Unlimited, Inc., 40 Fed. App'x 97, 101–02 (6th Cir. 2002) (indicating that rules should be designed to allocate the burden to the "'least cost avoider'–that is, the party who can avoid the [issue] at the lowest price."); In re L & S Industries, Inc., 112 B.R. 886, 887 (Bankr N.D. Ohio 1990) (allocating the burden of proving the amount of certain administrative expenses to the individual claiming the expenses, requiring more than simply listing the information in an expense schedule); see also Thomas R. Lee, Pleading and Proof: The Economics of Legal Burdens, 1997 BYU L. Rev. 1, 17 (1997) ("Because of the differentials in access to proof, the allocation of burdens performs important economizing functions. . . . Where defendant's direct costs of producing "core" evidence are lower than plaintiff's, assigning the risk of nonpersuasion to the defendant decreases the direct cost of producing that evidence."). Finally, financial information, while it may be confusing and complex, often will have one correct answer, making it possible for a debtor who intentionally makes false statements under oath to be charged criminally under 18 U.S.C. § 152. The size of a debtor's "economic unit" is a much more inexact inquiry, making a conviction under § 152 implausible, essentially eliminating one of the incentives a debtor has to provide accurate information.

Based on the above, the court adopts the following rebuttable presumption: If an individual is listed as a dependent on the debtor or the debtor's non-filing spouse's most recent income tax return, that individual is presumed to be a member of the debtor's bankruptcy "household." Either party can successfully rebut the presumption by providing documentation or other evidence. This is subject to further countervailing evidence. If an individual is not listed as a dependent on the debtor or debtor's non-filing spouse's most recent tax return, that individual is rebuttably presumed to not be a part of the debtor's "household." The party desiring a different conclusion has the initial burden of providing evidence showing the individual satisfies the "economic unit" definition. If that party can provide satisfactory evidence, the burden shifts to the opposing party to provide countervailing evidence. While the determination of whether an individual is within the debtor's "economic unit" should be determined on a case-by-case basis after evaluating all of the evidence, certain information may be especially helpful. A domestic relations order, such as a separation agreement or child custody order, may distribute a child's care in a manner that may assist the court in determining if a child is part of a debtor's "economic unit." However, the court should be cognizant of a domestic agreement that attempts to "even things out" and may not represent the economic realities of the parties. An official document completed before the debtor's contemplation of bankruptcy, such as an application for a residential loan or governmental assistance, which includes the debtor's household size may be relevant. Other information, such as receipts, bank statements, or credit card statements which either show or do not show costs consistent with caring for another may also be beneficial. However, a bald statement that an individual either is or is not part of the debtor's "household," without more, is insufficient when a good faith challenge is asserted.

The court also believes that an adult capable of supporting himself, but who is not working without reasonable cause and lives off the generosity of the debtor, usually should be excluded from the debtor's "household," even if the adult would otherwise satisfy the requirements of the "economic unit" definition. A contrary rule would result in a debtor's

10

creditors subsidizing the adult's decision not to work. There are obvious, appropriate exceptions to this rule that will be developed on a case-by-case basis.

### f) Application of the Presumptions and "Economic Unit" Definition

In the current case, Debtor claims seven people in his bankruptcy household: Debtor, Wife, Debtor's two children, and Wife's three children. Debtor claimed one of his two children on his 2012 federal income tax return. Wife claimed one of her three children on her 2012 federal income tax return. Because Debtor is divorced from his ex-wife, his children spend eight out of every fourteen days with Debtor and the remainder with his ex-wife. Debtor believes that his relationship with Wife and their five children represent a single economic unit. Trustee does not voice her opinion of Debtor's "household" size under the "economic unit" definition.

The court first notes that Debtor's 2012 federal income tax return creates a rebuttable presumption that one of his children is in his bankruptcy "household." Trustee provides no evidence to counter the presumption. However, Debtor's bankruptcy petition claims both of his children within his "household." In support of this position, Debtor's brief notes that both of his children live with him every Monday, Wednesday, and Friday, while alternating weekends with his ex-wife. Debtor hopes that his children's living arrangements will convince the court that both children are part of his "economic unit." However, Debtor does not provide any evidence of his children's living arrangements except for the statement in his brief. Debtor's bald statement, without any corroborating evidence, is insufficient to rebut the presumption that a child who is not claimed on a debtor's most recent income tax return is not a part of the debtor's "household." Wife claims one child on her 2012 income tax return, creating a rebuttable presumption that the child is within Debtor's "household." Trustee provides no evidence to counter the presumption. Debtor provides no evidence asserting that Wife's other two children are part of his "household," except for bare statements in his brief and bankruptcy petition. Statements, without more, are insufficient.

After accounting for the presumptions, Debtor's "household" consists of four members: Debtor, Wife, one of Debtor's children, and one of Wife's children. The applicable median for a four person household in Ohio is $74,270.00. Debtor calculates his annualized CMI, which includes a $2,000.00 monthly contribution from Wife, at $94,469.16. Debtor's annualized CMI is above the applicable median. Debtor must make chapter 13 plan payments for sixty months unless his debts are paid in full at an earlier time. However, when Debtor and Trustee compiled their legal arguments and evidence in support of their respective positions, both were unaware of the court's above adopted presumptions. As will be illustrated below, even assuming that Debtor provided evidence sufficient to rebut the presumptions and Trustee did not produce enough countervailing evidence, the ultimate outcome of this opinion does not change. For the ensuing analysis, the court assumes Debtor has rebutted the presumption that his and Wife's children that were unclaimed on their most recent income tax return are not within their bankruptcy "household."

When determining if an individual is part of the debtor's "economic unit," courts have utilized a number of factors:

13-61565-rk    Doc 39    FILED 01/09/14    ENTERED 01/10/14 09:14:30    Page 11 of 23

> 1) the degree of financial support provided to the individual by the debtor;
> 2) the degree of financial support provided to the debtor by the individual;
> 3) the extent to which the individual and the debtor share income and expenses;
> 4) the extent to which there is joint ownership of property;
> 5) the extent to which there are joint liabilities;
> 6) the extent to which assets owned by the debtor or the individual are shared, regardless of title; and
> 7) any other type of financial intermingling or interdependency between the debtor and the individual.

In re Morrison, 443 B.R. at 388. Most courts addressing the issue have applied the "economic unit" definition expansively. For example, in In re Morrison, 443 B.R. 378, the debtor and her boyfriend lived in the same home. The boyfriend paid the mortgage while the debtor paid for food, utilities, and other household goods. Id. at 382. Even though the two did not share any joint debts, the court concluded that because the two shared a "significant amount of their income and expenses," they should be considered one economic unit. Id. at 388. Similarly, in In re Herbert, 405 B.R. 165 (Bankr. W.D.N.C. 2008), the debtor lived with his girlfriend, his biological child, and his girlfriend's eight children from a previous relationship. While the girlfriend contributed $1,600.00 per month to household food expenses, the debtor still provided significant support to his girlfriend and her children. Id. at 167, 170–71. Even though the debtor and girlfriend were not married, the court still determined that the entire family operated as one economic unit and a "household" of eleven was appropriate. Id. at 170–71. Finally, in In re Jewell, 365 B.R. at 797–98, married debtors lived with their adult daughter and her three children. Because the debtors' daughter and her children were reliant on the debtors for financial support, the court determined that the daughter and her children were part of the debtors' economic unit. Id.

This court agrees with the reasoning of In re Morrison, In re Herbert, and In re Jewell. Debtor and Wife live in the same dwelling. Each contributes economic resources to the maintenance and support of each other, as well as the children.[10] The two are now married, resulting in greater joint-ownership of assets. The two also share a residence. Therefore, Debtor has satisfied a number of the factors outlined in In re Morrison, while also being at least as economically intertwined, if not more so, than the debtors in In re Morrison, In re Herbert, and In re Jewell. The court concludes that Debtor, Wife, Debtor's two children and all three of Wife's children are part of Debtor's economic unit.

However, the problem of how to count Debtor's children remains unresolved. Debtor's children, like many split households, spend some of their time with one parent, and the remainder with the other. This presents a dilemma, as the court must determine if a "part-time" child should count as one member of the debtor's "household," a fractional or "part-time" member, or no member at all. The court adopts the "part-time" approach, holding that a child

---

[10] Based on Wife's pay stubs, her average monthly gross income is $3,868.73. After subtracting taxes and other payroll expenses, Wife's average monthly net income is $2,568.02. Debtor includes a monthly contribution from Wife of $2,000.00 in his CMI.

that lives with the debtor some of the time, but also spends time living with another person, should be counted based on the percentage of time the child spends with the debtor. This "part time" approach approximates a debtor's actual costs. Johnson, 686 F.3d at 240–42; In re Robinson, 449 B.R. 473. The following example, simplified to more clearly demonstrate the benefits of the "part time" approach, illustrates how a different approach may lead to inequitable results. Married parents have two children and then divorce. Because Mother and Father were in very similar financial situations at the time of divorce, neither pays the other any type of support and evenly split custody of their two children, except for slight variations approved by the other parent for vacations or other events. Mother and Father both remarry, but fall upon tough economic times in their new relationships. Both file for bankruptcy at the same time. In their respective bankruptcy "households," should Mother claim both children, should Father claim both children, should neither claim a child, or should each claim one child? The proper result, and the result which basic fairness points towards, is that Mother and Father each claim one child. The "part time" approach leads to such a result. If a non-fractional approach is used, the court would attempt to discover which parent pays slightly more for support or has custody of the children for a longer period of time. Therefore, if Mother allows the children to attend a vacation or family event with Father, Father would likely claim both children within his "household" because he had custody for a slightly longer period of time, while Mother cannot claim either. In the above situation, the non-fractional approach is clearly at odds with the Code's goal of discerning a debtor's true economic situation.

Even though the court adopts the "part time" approach, it does so acknowledging its flaws. Some of a debtor's expenses are fixed and will not change based on the amount of time a child stays with the debtor (such as rent for a dwelling with the appropriate number of bedrooms), while other expenses are variable (such as food and clothing). In re Robinson, 449 B.R. at 483–84. A calculation of "household" that focuses on the number of days a child lives with the debtor fails to properly account for the debtor's fixed expenses. See id. at 484. However, the "part time" approach strikes a balance between accuracy and complexity, providing an easy calculation that satisfactorily estimates the true economic impact of a "part time" child. Additionally, Official Bankruptcy Form B22C gives a debtor flexibility in accounting for variable and fixed expenses, helping to offset any harmful consequences of the "part time" child approach. Id. It is possible that additional math or developments may further refine the process.

In the current case, Trustee did not object to Debtor claiming one child within his "household." The argument is really about the other—the child Debtor did not claim on his 2012 income tax return. However, both children must be analyzed collectively to reach an accurate result under the "part time" approach. Debtor's two children live with him every Monday, Wednesday, and Friday, while alternating weekends with his ex-wife. The custody arrangement results in Debtor's children living with him eight out of every fourteen days. Applying the fractional approach, Debtor's two children spend approximately the same amount of time with Debtor as one "full-time" child. For purposes of Debtor's bankruptcy "household," Debtor's two children count as one member. The court in In re Robinson, 449 B.R. 473, applied the "part time" approach and reached a similar result. In In re Robinson, the debtor was the father of four children, each of which spent four days per week with the debtor and the remainder with the mother. Id. at 475. The court determined that since each child spent approximately four-sevenths

13

of each week with the debtor, "they mathematically approximate, when viewed in the aggregate, two full members of the economic unit." Id. at 482.

Based on Debtor's lack of supporting evidence, Debtor has failed to rebut the court's presumptions and is only able to claim those children listed as dependents on Debtor and Wife's most recent income tax returns. Trustee has not provided any evidence to counter the dependents claimed on Debtor and Wife's 2012 income tax returns. Therefore, Debtor's "household" contains four members. The applicable median for a four person household within Ohio is $74,270.00. Debtor calculates his annualized CMI, which includes a $2,000.00 monthly contribution from Wife, at $94,469.16. Debtor's annualized CMI is above the applicable median. Even assuming Debtor produced evidence sufficient to rebut the court's presumption, Debtor's bankruptcy "household" would only consist of six members: Debtor, Wife, Debtor's children with a fractional amount of one, and all three of Wife's children. The applicable median for a six person household within Ohio is $90,470.00, meaning Debtor's CMI nevertheless remains above the applicable median. Debtor must make chapter 13 plan payments for sixty months unless his debts are paid in full at an earlier time. Because Debtor's annualized CMI is above the applicable median, this court need not address Trustee's argument that Debtor's inclusion of only a portion of Wife's income in Debtor's annualized CMI is improper.[11]

The court needs to note for the casual reader that this living arrangement is not unusual. It has become impossible to describe a range of typical living arrangements. Part-time living arrangements among individuals running a gamut of blood and non-blood relationships have multiplied explosively. It is beyond the ken of the courts to reduce these countless variations to a number based upon a tested algorithm. These limitless living arrangements have profound, splintering economic consequences. Just as an example, Debtor's schedules reflect that Debtor jointly owns a motor vehicle with a man who is the father of one or two (it is unclear) of Wife's children. It is not possible to ascribe traditional numbers to these types of situations. We should not kid one another. We are just doing the best we can. The search for a one-size-fits-all numerical straitjacket test is at best imprecise.

## Conclusion

The court adopts the "economic unit" definition, concluding that Debtor's "household" contains four members. Because Debtor's own calculation of his annualized CMI is above the applicable median, Debtor's applicable commitment period must be sixty months unless his creditors are paid in full at an earlier date. Debtor's plan does not propose to pay his creditors in full. Therefore, because Debtor's plan only proposes payments for thirty-six months, instead of the required sixty months, confirmation of Debtor's chapter 13 plan is **DENIED**.

An order will be entered simultaneously with this opinion.

---

[11] If, for example, the court calculated Debtor's "household" size at seven, Debtor's annualized CMI would have been below median. At that point, the court would have analyzed the amount of Wife's income Debtor should include in his annualized CMI, as any increase may cause Debtor to move from below to above median.

14

# # #

**Brian Alan Skiles**
230 37th St NW
Canton, OH 44709

**James F. Hausen**
Bates and Hausen, LLC
215 E. Waterloo Rd
Suite #17
Akron, OH 44319

**Toby L Rosen**
Toby L Rosen, Trustee
400 W Tuscarawas St
Charter One Bank Bldg, 4th Floor
Canton, OH 44702

Exhibit A



THE COMMON LAW IS THE WILL OF *Mankind* ISSUING FROM THE *life* OF THE *People*

SEARCH THE SITE

[ SEARCH ]

THE UNITED STATES
DEPARTMENT *of* JUSTICE

Home » About DOJ » Agencies » U.S. Trustee Program » Means Testing » Means Testing (Cases Filed On and After May 1, 2013) » Census Bureau Median Family Income By Family Size

🖨 Printer Friendly

U.S. Trustee Program
About the Program
Meet the Director
Regions and Offices
Private Trustee Information
Fee Guidelines
Consumer Information
Credit Counseling & Debtor Education
Means Testing Information
Bankruptcy Reform
Press & Public Affairs
Employment Opportunities
What's New
Site Map
USTP FOIA
Contact the Program

CENSUS BUREAU MEDIAN FAMILY INCOME BY FAMILY SIZE

✉ E-MAIL UPDATES

### (Cases Filed On and After May 1, 2013)

The following table provides median family income data reproduced in a format designed for ease of use in completing Bankruptcy Forms 22A and 22C.

**The State Median Family Income by Family Size** data is available for download in MS Excel format.
[XLSX - 14 KB]

| STATE | 1 EARNER | FAMILY SIZE | | |
| --- | --- | --- | --- | --- |
| | | 2 PEOPLE | 3 PEOPLE | 4 PEOPLE * |
| ALABAMA | $40,120 | $49,163 | $52,215 | $64,700 |
| ALASKA | $53,804 | $71,624 | $82,198 | $88,373 |
| ARIZONA | $42,107 | $55,118 | $55,854 | $61,023 |
| ARKANSAS | $36,505 | $46,333 | $49,494 | $59,591 |
| CALIFORNIA | $48,415 | $63,030 | $67,401 | $75,656 |
| COLORADO | $49,549 | $65,631 | $72,259 | $86,787 |
| CONNECTICUT | $58,337 | $72,878 | $86,390 | $102,530 |
| DELAWARE | $48,284 | $62,707 | $73,284 | $95,150 |
| DISTRICT OF COLUMBIA | $50,186 | $81,960 | $81,960 | $81,960 |
| FLORIDA | $41,915 | $51,760 | $54,934 | $65,260 |
| GEORGIA | $41,214 | $51,954 | $56,189 | $67,214 |
| HAWAII | $49,919 | $63,896 | $76,001 | $84,690 |
| IDAHO | $41,785 | $49,896 | $50,506 | $62,322 |
| ILLINOIS | $47,485 | $59,861 | $68,721 | $80,776 |
| INDIANA | $42,089 | $52,618 | $58,916 | $70,763 |
| IOWA | $42,207 | $58,852 | $64,552 | $78,366 |
| KANSAS | $42,577 | $56,851 | $65,907 | $76,402 |
| KENTUCKY | $40,020 | $46,815 | $55,613 | $67,783 |
| LOUISIANA | $37,967 | $47,731 | $55,863 | $70,347 |
| MAINE | $41,488 | $53,227 | $60,425 | $79,931 |
| MARYLAND | $58,209 | $73,685 | $87,206 | $108,915 |
| MASSACHUSETTS | $55,602 | $67,443 | $82,495 | $103,624 |
| MICHIGAN | $45,029 | $52,621 | $61,715 | $73,864 |
| MINNESOTA | $48,097 | $63,654 | $76,909 | $89,126 |
| MISSISSIPPI | $38,240 | $43,095 | $46,062 | $59,248 |
| MISSOURI | $41,092 | $51,784 | $59,549 | $72,150 |
| MONTANA | $42,301 | $54,382 | $56,977 | $67,055 |
| NEBRASKA | $41,881 | $59,543 | $67,235 | $77,057 |
| NEVADA | $44,924 | $55,674 | $55,674 | $66,582 |
| NEW HAMPSHIRE | $52,588 | $65,830 | $82,924 | $99,457 |
| NEW JERSEY | $61,146 | $69,697 | $85,016 | $103,786 |
| NEW MEXICO | $38,349 | $51,965 | $51,965 | $61,817 |
| NEW YORK | $47,790 | $59,308 | $69,052 | $83,209 |
| NORTH CAROLINA | $40,710 | $51,812 | $56,339 | $84,983 |
| NORTH DAKOTA | $41,557 | $61,492 | $68,688 | $86,653 |
| OHIO | $42,814 | $53,218 | $60,960 | $74,270 |
| OKLAHOMA | $40,685 | $51,575 | $53,500 | $64,374 |
| OREGON | $43,180 | $55,057 | $62,202 | $67,315 |
| PENNSYLVANIA | $47,439 | $55,210 | $68,848 | $82,078 |
| RHODE ISLAND | $46,896 | $61,607 | $76,864 | $83,785 |
| SOUTH CAROLINA | $39,238 | $50,548 | $53,532 | $61,388 |
| SOUTH DAKOTA | $38,071 | $57,188 | $65,829 | $73,960 |
| TENNESSEE | $39,891 | $48,617 | $55,080 | $65,038 |
| TEXAS | $41,225 | $55,895 | $60,503 | $67,298 |
| UTAH | $50,976 | $56,089 | $63,430 | $66,590 |

| | | | | |
|---|---|---|---|---|
| VERMONT | $46,019 | $61,702 | $87,774 | $95,750 |
| VIRGINIA | $53,328 | $65,930 | $77,585 | $91,661 |
| WASHINGTON | $52,724 | $65,123 | $71,289 | $83,270 |
| WEST VIRGINIA | $41,499 | $44,536 | $54,790 | $66,756 |
| WISCONSIN | $43,661 | $59,688 | $65,775 | $81,296 |
| WYOMING | $45,336 | $63,193 | $73,688 | $78,733 |

\* For cases filed on or before March 31, 2013, add $7,500 for each individual in excess of 4.
  For cases filed on or after April 1, 2013, add $8,100 for each individual in excess of 4.

| COMMONWEALTH OR U.S. TERRITORY | FAMILY SIZE | | | |
|---|---|---|---|---|
| | 1 EARNER | 2 PEOPLE | 3 PEOPLE | 4 PEOPLE \* |
| GUAM | $38,410 | $45,925 | $52,334 | $63,331 |
| NORTHERN MARIANA ISLANDS | $25,793 | $25,793 | $30,008 | $44,137 |
| PUERTO RICO | $22,392 | $22,392 | $23,537 | $28,180 |
| VIRGIN ISLANDS | $30,475 | $36,627 | $39,052 | $42,785 |

\* For cases filed on or before March 31, 2013, add $7,500 for each individual in excess of 4.
  For cases filed on or after April 1, 2013, add $8,100 for each individual in excess of 4.

FRIDAY, SEPTEMBER 27, 2013 10:50 AM

**U.S. DEPARTMENT _of_ JUSTICE** | 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001          **JUSTICE.GOV**

**ABOUT**
The Attorney General
Budget & Performance
Strategic Plans

**AGENCIES**

**BUSINESS & GRANTS**
Business Opportunities
Small & Disadvantaged Business
Grants

**RESOURCES**
Forms
Publications
Case Highlights
Legislative Histories

**NEWS**
Justice News
The Justice Blog
Public Schedule
Videos
Photo Gallery

**CAREERS**
Legal Careers
Interns, Recent Graduates, and Fellows
Diversity Policy
Veteran Recruitment

**CONTACT**

Site Map
A to Z Index
Archive
Accessibility
FOIA
No FEAR Act
Information Quality
Privacy Policy
Legal Policies & Disclaimers

For Employees
Office of the Inspector General
Government Resources
USA.gov
BusinessUSA

Exhibit B



THE COMMON LAW IS THE WILL OF *Mankind* ISSUING FROM THE *Life* OF THE *People*

THE UNITED STATES
**DEPARTMENT** *of* **JUSTICE**

Home » About DOJ » Agencies » U.S. Trustee Program » Means Testing » Means Testing (Cases Filed Between May 1, 2013, and November 14, 2013, Inclusive)

🖶 Printer Friendly

| | |
|---|---|
| **MEANS TESTING** | ✉ E-MAIL UPDATES |

U.S. Trustee Program

About the Program

Meet the Director

Regions and Offices

Private Trustee Information

Fee Guidelines

Consumer Information

Credit Counseling & Debtor Education

Means Testing Information

Bankruptcy Reform

Press & Public Affairs

Employment Opportunities

What's New

Site Map

USTP FOIA

Contact the Program

# Census Bureau, IRS Data and Administrative Expenses Multipliers

### (Cases Filed Between May 1, 2013, and November 14, 2013, Inclusive)

## Section I. Census Bureau Data

In Part III of Bankruptcy Form 22A and Part II of Bankruptcy Form 22C, debtors are instructed to enter the "Applicable median family income". This information is published by the Census Bureau according to State and family size, and the data is updated each year. In addition, pursuant to 11 U.S.C. § 101(39A)(B), the data on this Web site will be further adjusted early each calendar year based upon the Consumer Price Index for All Urban Consumers (CPI).

The following link provides the median family income data published in January 2013 , reproduced in a format that is designed for ease of use in completing these bankruptcy forms.

**Median Family Income Based on State/Territory and Family Size**

Available for download in MS Excel format. [XLSX - 14 KB]

## Section II. IRS Data & General Information for Completing Bankruptcy Forms

**Note:** The IRS expense figures posted on this Web site are for use in completing bankruptcy forms. They are not for use in computing taxes or for any other tax administration purpose. Expense information for tax purposes can be found on the IRS Web site. In addition, the following language is taken directly from the IRS Collection Financial Standards available at the IRS Website noted above. The IRS Collection Financial Standards use the word "taxpayer" and this reference has been unchanged for purposes of publishing the Standards for use in bankruptcy cases.

### 1. General Information Regarding IRS Collection Financial Standards

Collection Financial Standards are used to help determine a taxpayer's ability to pay a delinquent tax liability. Allowable living expenses include those expenses that meet the necessary expense test. The necessary expense test is defined as expenses that are necessary to provide for a taxpayer's (and his or her family's) health and welfare and/or production of income.

National Standards for food, clothing and other items apply nationwide. Taxpayers are allowed the total National Standards amount for their family size, without questioning the amount actually spent.

National Standards have also been established for minimum allowances for out-of-pocket health care expenses. Taxpayers and their dependents are allowed the standard amount on a per person basis, without questioning the amount actually spent.

Maximum allowances for housing and utilities and transportation, known as the Local Standards, vary by location. In most cases, the taxpayer is allowed the amount actually spent, or the local standard, whichever is less.

Generally, the total number of persons allowed for necessary living expenses should be the same as those allowed as exemptions on the taxpayer's most recent year income tax return.

If the IRS determines that the facts and circumstances of a taxpayer's situation indicate that using the standards is inadequate to provide for basic living expenses, we may allow for actual expenses. However, taxpayers must provide documentation that supports a determination that using national and local expense standards leaves them an inadequate means of providing for basic living expenses.

### 2. National Standards: Food Clothing & Other Items

National Standards have been established for five necessary expenses: food, housekeeping supplies, apparel and services, personal care products and services, and miscellaneous.

The standards are derived from the Bureau of Labor Statistics (BLS) Consumer Expenditure Survey (CES). The survey collects information from the Nation's households and families on their buying habits (expenditures), income and household characteristics.

Available for download in MS Excel format. [XLSX - 12 KB]

### 3. National Standards: Out-of-Pocket Health Care Expenses

Out-of-Pocket Health Care standards have been established for out-of-pocket health care expenses including medical services, prescription drugs, and medical supplies (e.g. eyeglasses, contact lenses, etc.).

The table for health care allowances is based on Medical Expenditure Panel Survey data and uses an average amount per person for taxpayers and their dependents under 65 and those individuals that are 65 and older.

The out-of-pocket health care standard amount is allowed in addition to the amount taxpayers pay for health insurance.

Available for download in MS Excel format. [XLSX - 19 KB]

### 4. Local Standards. Housing and Utilities and Transportation

**a. Housing and Utilities Standards** are derived from Census and BLS data, and are provided by state down to the county level. The standard for a particular county and family size includes both housing and utilities allowed for a taxpayer's primary place of residence.

Housing and Utilities standards include mortgage or rent, property taxes, interest, insurance, maintenance, repairs, gas, electric, water, heating oil, garbage collection, telephone, cell phone, internet, and cable. The tables include five categories for one, two, three, four and five or more persons in a household.

**Note:** Effective October 3, 2011, the IRS no longer provides Housing and Utilities Standards for the U.S. territories of Guam, the Northern Mariana Islands, and the Virgin Islands.

[Select State]       Go

Available for download in MS Excel format. [XLSX - 667 KB]

**b. Transportation Expense Standards** for taxpayers with a vehicle consist of two parts:  nationwide figures for monthly loan or lease payments referred to as ownership costs, and additional amounts for monthly operating costs broken down by Census Region and Metropolitan Statistical Area (MSA). A conversion chart has been provided with the standards that lists the states that comprise each Census Region, as well as the counties and cities included in each MSA. The ownership cost portion of the transportation standard, although it applies nationwide, is still considered part of the Local Standards.

The ownership costs provide maximum allowances for the lease or purchase of up to two automobiles if allowed as a necessary expense. A single taxpayer is normally allowed one automobile.

The operating costs include maintenance, repairs, insurance, fuel, registrations, licenses, inspections, parking and tolls.

If a taxpayer has a car payment, the allowable ownership cost added to the allowable operating cost equals the allowable transportation expense. If a taxpayer has a car, but no car payment, only the operating costs portion of the transportation standard is used to figure the allowable transportation expense. In both of these cases, the taxpayer is allowed the amount actually spent, or the standard, whichever is less.

There is a single nationwide allowance for public transportation based on BLS expenditure data for mass transit fares for a train, bus, taxi, ferry, etc. Taxpayers with no vehicle are allowed the standard, per household, without questioning the amount actually spent.

If a taxpayer owns a vehicle and uses public transportation, expenses may be allowed for both, provided they are needed for the health, and welfare of the taxpayer or family, or for the production of income. However, the expenses allowed would be actual expenses incurred for ownership costs, operating costs and public transportation, or the standard amounts, whichever is less.

[Select Region]       Go

Available for download in MS Excel format. [XLSX - 11 KB]

### Section III. Administrative Expenses Multipliers

11 U.S.C. § 707(b)(2)(A)(ii)(III) allows a debtor who is eligible for chapter 13 to include in his/her calculation of monthly expenses the actual administrative expenses of administering a chapter 13 plan in the judicial district where the debtor resides.

The Executive Office for U.S. Trustees issues the schedules of actual administrative expenses which contain, by judicial district, the chapter 13 multiplier needed to complete Official Bankruptcy Forms 22A and 22C (Statement of Current Monthly Income and calculations). Form 22A is the form most chapter 7 debtors will complete and the multiplier is entered on Line 45.b; Form 22C is the form most chapter 13 debtors will complete and the multiplier is entered on Line 50.b.

**Schedules of Actual Administrative Expenses of Administering a Chapter 13 Plan (as Required by 11 U.S.C. § 707(b)(2)(A)(ii)(III))**

Available for download in MS Excel format. [XLSX - 14 KB]

**Note:**

The original source for the State Median Family Income is the Census Bureau.

The original source for the National and Local Standards is the IRS.

To report any differences between the data on these pages and their original source, please e-mail: ust.mt.help@usdoj.gov.

MONDAY, AUGUST 5, 2013 3:11 PM

**U.S. DEPARTMENT of JUSTICE**   950 Pennsylvania Avenue, NW, Washington, DC 20530-0001

**JUSTICE.GOV**

**ABOUT**
The Attorney General
Budget & Performance
Strategic Plans

**AGENCIES**

**BUSINESS & GRANTS**
Business Opportunities
Small & Disadvantaged Business
Grants

**RESOURCES**
Forms
Publications
Case Highlights
Legislative Histories

**NEWS**
Justice News
The Justice Blog
Public Schedule
Videos
Photo Gallery

**CAREERS**
Legal Careers
Interns, Recent Graduates, and Fellows
Diversity Policy
Veteran Recruitment

**CONTACT**

Site Map
A to Z Index
Archive
Accessibility
FOIA
No FEAR Act
Information Quality
Privacy Policy
Legal Policies & Disclaimers

For Employees
Office of the Inspector General
Government Resources
USA.gov
BusinessUSA

Exhibit C

# Current Population Survey (CPS)

## Current Population Survey (CPS) - Definitions

### Introduction

The definitions and explanations found in reports in the Current Population Reports series issued by the Census Bureau are largely drawn from various technical and procedural materials used in the collection of data in the Current Population Survey. The concepts defined below generally refer to current definitions. For reports based on earlier surveys, especially those published before 1990, the user should consult the printed reports for those years. As reports and surveys continue to evolve, definitions may also alter to accommodate these changes. We will alert users to significant changes in the concepts presented in the reports released on the Internet to enable them to accurately interpret the data for historical comparisons.

<u>Birth cohort</u>

<u>Births, Out of wedlock</u>

<u>Child Support</u>

<u>Children</u>

<u>Children ever born</u>

<u>College enrollment</u>

<u>Citizenship status</u>

<u>Country of birth</u>

<u>Country of birth and Year of entry</u>

<u>Earnings</u>

<u>Educational attainment</u>

<u>Employed People</u>

<u>Ethnic origin</u>

<u>Family</u>

<u>Family group</u>

<u>Family household</u>

<u>Foreign-born (See Native born)</u>

<u>Geographic regions (See Regions, geographic)</u>

<u>Group quarters</u>

<u>Head Start</u>

<u>Health Insurance Coverage</u>

<u>Household</u>

A household consists of all the people who occupy a housing unit. A house, an apartment or other group of rooms, or a single room, is regarded as a housing unit when it is occupied or intended for occupancy as separate living quarters; that is, when the occupants do not live with any other persons in the structure and there is direct access from the outside or through a common hall.

A household includes the related family members and all the unrelated people, if any, such as lodgers, foster children, wards, or employees who share the housing unit. A person living alone in a housing unit, or a group of unrelated people sharing a housing unit such as partners or roomers, is also counted as a household. The count of households excludes group quarters. There are two major categories of households, "family" and "nonfamily". (See definitions of Family household and Nonfamily household).

Household, family, or subfamily, Size of

Household, nonfamily

Householder

Income Measurement:

Income-to-poverty ratios

Marital status

Marriage cohort

Marriage, Age at first

Married couple

Mean (Average) income

Median income

Metropolitan-nonmetropolitan residence

Migration, allocations of data

Migration universe

Mobility status

Modal grade: (see School, Modal grade)

Moving, Reasons for

Native born

Nativity

Parity

Per capita income

Population coverage

Poverty definition

Race

Reference person

Regions, Geographic

Residence, Duration of (Voting Supplements)

Rounding

Size of household, family, or subfamily (See Household, family, or subfamily, size of)

School, dropout rate, annual high school

School enrollment

School, Level of:

School, Modal grade

School, Nursery

School, Public or private

13-61565-rk   Doc 39   FILED 01/09/14   ENTERED 01/10/14 09:14:30   Page 22 of 23

Secondary individuals

Step family

Subfamily

Tenure

Undocumented immigrants or illegal aliens

Unemployed people

Units in structure

Unmarried couple

Unrelated individuals

Vocational school enrollment

Voting, people eligible to register

Voter, reported participation

Voter, reported registration

Work Experience

## Footnotes

[1] *For a detailed discussion of the original SSA poverty thresholds, see Mollie Orshansky, Counting the Poor: Another Look at the Poverty Profile, Social Security Bulletin, vol. 28, no. 1, January 1965, pp. 3-29 (reprinted in Social Security Bulletin, vol. 51, no. 10, October 1988, pp. 25-51); and Who's Who Among the Poor: A Demographic View of Poverty, Social Security Bulletin, vol. 28, no. 7, July 1965, pp. 3-32.*

[2] *Poverty thresholds for 1959-1967 were recalculated on this basis, and revised poverty population figures for those years were tabulated using the revised thresholds. These revised 1959-1967 poverty population figures have been published in Census Bureau reports issued since August 1969 (including the present report). Because of this revision, poverty statistics from documents dated before August 1969 are not comparable with current poverty statistics.*

[PDF] or 🔲 denotes a file in Adobe's Portable Document Format. To view the file, you will need the Adobe® Reader® 🔲 available free from Adobe.

Source: U.S. Census Bureau | Current Population Survey (CPS) | Last Revised: 2013-10-29T09:34:40.103-04:00

13-61565-rk    Doc 39    FILED 01/09/14    ENTERED 01/10/14 09:14:30    Page 23 of 23